# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

———————————————

JULIA P. GARRETT, as Personal Representative of the Estate
of Wyatt Dean Garrett, deceased,

Appellant,

v.

AGNES LYNCH, ARNP; SARASOTA PAIN MANAGEMENT; and
PHYSICIAN PARTNERS OF AMERICA,

Appellees.

No. 2D2025-1356

———————————————

July 10, 2026

Appeal from the Circuit Court for Hillsborough County; Jennifer X. Gabbard, Judge.

Jeffrey B. Crockett of Coffey Burlington, P.L., Miami, for Appellant.

Damien M. Hoffman and Mark E. McLaughlin of Beytin, McLaughlin, McLaughlin, Osborne, Brumby, Hoffman & Mirelman, P.A., Tampa, for Appellees Agnes Lynch, ARNP, and Physician Partners of America.

No appearance for remaining Appellee.

GUARD, Judge.

In 2019, fentanyl killed 3,244 people in Florida. *See* MED. EXAM'RS COMM'N, DRUGS IDENTIFIED IN DECEASED PERSONS BY FLORIDA MEDICAL EXAMINERS, at ii (2019). That number constituted a thirty-eight percent increase in deaths compared to 2018. *Id.* Fentanyl caused more deaths in Florida than any other drug that year. *Id.* Wyatt Dean Garrett died in

2019.  He did not die of a fentanyl overdose, and fentanyl did not cause his death in a manner reflected in those startling statistics.  But he died, in part, because of the response to the opioid epidemic and the misprescribing and abuse of fentanyl by others.  Garrett believed he needed fentanyl for his chronic pain and, when he could no longer get a prescription for it because of the tougher regulatory environment, he committed suicide.  While his death is tragic, that tragedy does not translate into a duty owed under these circumstances.  Accordingly, we affirm.

## I.

This is a medical malpractice wrongful death case.  Garrett served in the United States Army.  He injured his back while deployed during Operation Desert Storm.  He attempted to resolve that injury and relieve his chronic back pain by undergoing surgery, twice, with providers not involved in this case.  Those surgeries failed to relieve his pain.

At some time more than ten years before his death, Garrett became a patient at Sarasota Pain Management.  While a patient at Sarasota Pain Management, Garrett received treatment from Dr. Chun and, after 2017, by Agnes Lynch.  Dr. Chun owned Sarasota Pain Management and was its treating physician.  Lynch was an Advanced Practice Registered Nurse, who was supervised by Dr. Chun.  Dr. Chun prescribed Garrett two powerful fentanyl products to help Garrett with his back pain (1) Duragesic and (2) Actiq.  Duragesic is a transdermal fentanyl patch that provides long-term pain relief for severe chronic pain for up to seventy-two hours.  Actiq is a rapid-acting, short-lasting lollipop-like transmucosal fentanyl lozenge used to manage breakthrough cancer pain.  The risk of overdose and addiction with Actiq is so severe that to prescribe it the Food and Drug Administration (FDA) mandates a

2

healthcare provider complete an additional course and become certified in the Transmucosal Immediate Release Fentanyl Risk Evaluation and Mitigation Strategy Program (TIRF REMS).

Dr. Chun was TIRF REMS certified. Lynch was not TIRF REMS certified. Indeed, Lynch did not and could not prescribe the opioids that Garrett received as she did not have a Drug Enforcement Administration Registration and Sarasota Pain Management did not authorize her to prescribe such medications even if she did.

Garrett's Actiq prescription was "off-label," meaning it was prescribed to Garrett for a use that had not been officially approved by the FDA. Prescribing a medication for off-label use, in and of itself, is not unlawful or in any way wrong for a health care provider. *See* U.S. FOOD AND DRUG ADMIN., UNDERSTANDING UNAPPROVED USE OF APPROVED DRUGS "OFF LABEL" (2018) (stating that "healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient"). The evidence is undisputed that Garrett had used Duragesic and Actiq for more than ten years without incident.

Garrett had a monthly appointment with either Dr. Chun or Lynch. From 2017 until January 2019, Lynch saw Garrett five or six times. In 2018, Dr. Chun lowered the number of doses of Actiq that Garrett received. He did so because of "government regulations" and "government interventions" that were limiting somehow his ability to prescribe fentanyl. The record does not contain much detail relating to what regulations or interventions were causing Dr. Chun to reduce Garrett's Actiq prescription. There is no deposition of Dr. Chun in the record. The only things in the record relating to government pressure on Dr. Chun are Julia Garrett's testimony and lawyer commentary during

3

the depositions and the summary judgment hearing. Julia Garrett testified that one of Garrett's appointments was cancelled because the police were at Dr. Chun's office when they arrived. Her understanding was that the police were there and the office was closed because Dr. Chun overmedicated patients.[1] And during multiple of the depositions and in arguments, the lawyers for both parties commented that Dr. Chun was indicted and convicted for receiving kickbacks related to a different fentanyl product, Subsys, and was sentenced to three and a half years in prison. It is unclear if the police at his office on the day Julia Garrett was there were related to Dr. Chun's criminal conviction or if Dr. Chun in 2018 was aware that he was under criminal investigation.

While we do not have a deposition of Dr. Chun, we do have Dr. Chun's notes in Garrett's chart. In the notes for Garrett's June 2018 appointment, Dr. Chun raised to Garrett the possibility of Actiq being cutoff to Garrett to which Garrett allegedly stated that he would have a "heart attack" and would rather die than suffer the severe pain he would be in without Actiq. Similarly, in the notes of Garrett's July 2018 appointment, Dr. Chun again raised the possibility of Actiq being cutoff because of "government regulations facing us." This time Garrett purportedly stated that "he would rather die and commit suicide than live a life of such pain level." It does not appear that Dr. Chun did much in response to either comment. For example, Dr. Chun did not have Garrett evaluated or committed for suicidal ideation.

Sometime in December 2018 through January 2019, Dr. Chun sold his practice to Physician Partners of America (PPOA). PPOA is a chain of pain management clinics in the United States. Dr. Chun did not

---

[1] Julia Garrett believed that her husband was overmedicated by Dr. Chun.

continue practicing at PPOA. Dr. James Adams replaced Dr. Chun and he became the doctor for Dr. Chun's former patients, including Garrett. Dr. Adams retained Lynch and began supervising her. Dr. Adams was not TIRF REMS certified. Lynch was unaware that Dr. Adams was not TIRF REMS certified until sometime after January 11, 2019. After taking over, Dr. Adams generally told Lynch that he wanted to alter the products prescribed away from opioid products, like Actiq, and reduce the morphine milligram equivalents (the strength of opioids) prescribed to Dr. Chun's former patients.

On January 11, 2019, Garrett had his monthly appointment. He met with Lynch, not Dr. Adams. During his appointment, Lynch told Garrett that Dr. Adams planned to change his prescriptions away from Actiq and reduce the amount of opioids prescribed to Garrett. Garrett did not want his prescriptions changed, argued briefly with Lynch, and terminated his doctor-patient relationship with Lynch, Dr. Adams, and PPOA. Lynch documented his discharge and spoke to Dr. Adams. Her note stated "[d]ischarged from the practice related to not accepting changes of his pain medications." Despite not seeing Garrett, Dr. Adams wrote a note that stated: "[h]ave expressed to p[atien]t that we will not be prescribing Actiq again on an outpatient basis after this visit. P[atien]t expressed that he wishes to be discharged from this clinic. Discharge p[atien]t from clinic." Dr. Adams prescribed a month of Duragesic and Actiq for Garrett to allow him to obtain a new pain management specialist.

Garrett attempted to obtain both prescriptions, but the pharmacist refused to fill the Actiq prescription because Dr. Adams was not TIRF REMS certified. Lynch first learned that Dr. Adams was not TIRF REMS certified because of the prescription not being filled. Dr. Adams then

5

prescribed Garrett other opioids to replace Actiq. Garrett filled the Duragesic prescription but refused to fill the other prescriptions that Dr. Adams prescribed as a substitute for Actiq because they were not Actiq. Lynch spoke with Garrett twice after he ceased being a PPOA patient and provided him with the names of other pain management specialists in the area. There are no notes about those conversations in Garrett's chart.

After leaving the care of PPOA, Garrett went about attempting to find a new pain management specialist. He found finding a new pain management specialist difficult. Making it more difficult was Garrett's unwillingness to be prescribed any opioid product that was not Actiq. At least two times, Garrett told staff associated with pain management specialists that he would kill himself if he was not prescribed fentanyl. Law enforcement committed Garrett twice for suicidal ideation because of those comments. Though, in both instances, Garrett was released. He explained to his wife that he was not suicidal and that he had been trying to pressure the doctors into prescribing him Actiq. He saw more than five other doctors after leaving his January 11, 2019, appointment at PPOA. None of those doctors believed that Garrett was suicidal. None prescribed him Actiq. Some were willing to prescribe other opioids, but Garrett refused. On April 16, 2019, Garrett committed suicide, more than ninety days after his discharge from PPOA, after a primary care appointment where he hoped to receive a referral to another pain management specialist was cancelled.

Julia Garrett, as Garrett's personal representative, filed suit against Lynch for malpractice and PPOA for vicarious liability for Lynch's

malpractice.[2]  She did not sue Dr. Chun, Dr. Adams, or any other medical professional that treated Garrett.  On January 27, 2025, the trial court granted summary judgment to Lynch and PPOA, concluding that (1) Lynch and PPOA owed no duty to Garrett after Garrett discharged them and (2) Lynch and PPOA were not the proximate cause of Garrett's death.  On May 12, 2025, the trial court entered final judgment for Lynch and PPOA.  This appeal timely followed.

## II.

## A.

Generally, we review a grant of summary judgment de novo.  *See McWhorter v. Event Servs. Am., Inc.*, 427 So. 3d 179, 181 (Fla. 2d DCA 2026).  Summary judgment is appropriate, if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fla. R. Civ. P. 1.510(a).  In this case, the question we address is the existence of a legal duty, which is also subject to de novo review as a question of law.  *See McWhorter,* 427 So. 3d at 182.

## B.

The elements of a medical malpractice claim are (1) the existence of a duty, (2) a breach of that duty, (3) causation of harm by that breach, and (4) damages.  *Barber v. Manatee Mem. Hosp.*, 388 So. 3d 279, 286 (Fla. 2d DCA 2024) (citing *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 981 (Fla. 2018)).  Our supreme court has recognized "four sources of duty: (1) statutes or regulations; (2) common law interpretations of those statutes or regulations; (3) other sources in the common law; and (4) the general facts of the case."  *Limones v. Sch. Dist.*

---

[2] She also filed suit against Sarasota Pain Management.  Sarasota Pain Management has not appeared in this appeal.

7

*Lee Cnty.*, 161 So. 3d 384, 389 (Fla. 2015) (citing *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 n.2 (Fla. 1992)).

In arguing a duty existed, Julia Garrett relies on three sources to establish a duty: (1) § 766.102, Florida Statutes (2019), (2) the Florida Supreme Court's decision in *Chirillo v. Granicz*, 199 So. 3d 246 (Fla. 2016), and (3) the Third District Court of Appeal's decision in *Burley v. Vill. S., Inc.*, 407 So. 3d 572 (Fla. 3d DCA 2025). We conclude that none of those three sources support a duty here.

First, as to section 766.102, Julia Garrett cites the requirement in subsection (1) that establishes the generalized standard of care for a health care provider. § 766.102(1) (stating that the standard of care for "a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers"). By its terms, section 766.102(1) applies to health care providers, which is more than just physicians and would include nurse practitioners. *See Univ. of Fla. Bd. of Trs. v. Carmody*, 372 So. 3d 246, 249 (Fla. 2023) (applying the requirements of section 766.102 to a nurse practitioner). But that by itself does not resolve whether a duty exists.

As we have stated, "[u]nlike most duties, the physician's duty to the patient is explicitly relational: physicians owe a duty of care to *patients*." *Torres v. Sarasota Cnty. Pub. Hosp. Bd.*, 961 So. 2d 340, 344 (Fla. 2d DCA 2007) (quoting Restatement (Third) of Torts Liab. For Physical Harm § 41 cmt. h (Proposed Final Draft No. 1, 2005)). Nurse practitioners, nurses, and other health care providers' duties should also be similarly relational as they arise out of the physician-patient relationship. *See Drew v. Knowles*, 511 So. 2d 393, 396 (Fla. 2d DCA 1987) (discussing

8

medical malpractice liability for nurses). While a duty existed to Garrett during the time he was a patient of PPOA, that duty ended when he terminated that relationship. *See, e.g.*, *Vargas v. Glades Gen. Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990); *see also Haslett v. Broward Health Imperial Point Med. Ctr.*, 197 So. 3d 124, 127 (Fla. 4th DCA 2016) (observing that no common law duty exists to a patient after the patient is discharged from a facility).

Nothing in *Chirillo* suggests a different result. In *Chirillo*, the Supreme Court of Florida resolved an interdistrict conflict relating to whether a doctor owed a duty to a current patient in an outpatient setting when the patient committed suicide. 199 So. 3d at 251. In analyzing whether a duty existed, the court approved of the decision in *Paddock v. Chacko*, 522 So. 2d 410, 415-17 (Fla. 5th DCA 1988), which held that a doctor owed no duty to a patient he was treating on an outpatient basis to prevent the patient's suicide. *See Chirillo*, 199 So. 3d at 251. The approval by the Supreme Court of the holding of *Paddock* does not help the personal representative's argument that there is a duty in this case. But the court in *Chirillo* continued, stating that "the nonexistence of one specific type of duty does not mean that [the doctor] owed the decedent no duty at all." *Id.* The court then concluded that a duty did exist because the doctor was in a doctor-patient relationship at the time of the suicide and owed a statutory duty to the patient under section 766.102. *See id.* *Chirillo* does not suggest that a duty exists once Garrett terminated his health care provider relationship.[3]

_____

[3] The facts in *Chirillo* are also significantly different than the facts here. The patient in *Chirillo* was being treated by a doctor on an outpatient basis for depression. *See id.* at 247-48. She called her doctor's office and told the doctor's medical assistant that she was stopping taking Effexor, an antidepressant, because of its side effects

Similarly, nothing in *Burley* suggests that a duty exists here. In *Burley*, the Third District concluded that a duty existed to a discharged, involuntarily committed patient of an in-patient drug treatment facility. 407 So. 3d at 577-79. Unlike in this case, a specific statute created a duty for inpatient facilities discharging a patient and required the facility to take specific actions. *See id.* at 577-78 (citing to sections 397.6751(1)(f), (3), Florida Statutes (2016), as creating a duty to refer a discharged patient from an inpatient facility to "a more appropriate setting for care"). In determining that a duty existed, the court also relied on the facts of the case, which showed that the provider had a specific policy that required it to "'provide a linkage or appointment' with a 'specific doctor.'" *Id.* at 578. In concluding a duty existed, the court was careful to delineate and limit the duty on the facility to actions before his discharge and not after it left the facility. *See id.* at 579.

The parties have not cited to, and we could not find a statute or other source that imposes any duty on a health care provider relating to the care that is to be provided to an outpatient when that patient terminates the health care provider-patient relationship and is discharged from care. That is not that surprising, as the duties owed to inpatient patients have been consistently higher than those owed to outpatient patients. *See Chirillo*, 199 So. 3d at 251-52 (discussing the difference of the duty to prevent suicide between inpatient facilities and outpatient treatment). The parties have also not cited to and we could

---

and that she had not "felt right" for more than three months. *See id.* at 248. The patient's doctor received that information, changed her prescription to another antidepressant, and referred her to a gastroenterologist. *See id.* The doctor did not schedule an appointment or take any other action. *See id.* The patient committed suicide the next day. *See id.*

10

not find in the record any policy or testimony of a policy of PPOA requiring any specific course of action when a patient terminates his relationship and is discharged for care.

At oral argument, lawyers for the personal representative focused on the fact that Garrett received an Actiq prescription at his January 11, 2019, appointment after terminating his relationship as creating some sort of duty that was breached when the prescription was refused for lack of TIRF REMS certification. While not argued in the briefs, Florida recognizes that someone with no duty who undertakes to act has a duty to act carefully and not put others at an undue risk of harm. *See, e.g.,* *Clay Elec. Co-Op, Inc. v. Johnson,* 873 So. 2d 1182, 1186 (Fla. 2003). One problem with this argument is that it was Dr. Adams that prescribed the Actiq, not Lynch. The prescription was refused because Dr. Adams was not TIRF REMS certified, not because of anything connected to Lynch. Even as to PPOA, the personal representative sued PPOA for vicarious liability of Lynch's alleged negligence, not Dr. Adams' negligence. Even if we were willing to accept this last-ditch argument and it somehow implicated Lynch, which it does not, it is undisputed that that prescription was for thirty days, not more than three months. We would not be inclined to have such a duty exist indefinitely, into perpetuity, or past the point where the patient entered the care of other doctors. Any duty created by giving the prescription would have expired when the prescription was set to be exhausted, which was well before Garrett's suicide.

### III.

We are not unsympathetic to the situation faced by Garrett or Julia Garrett's loss. His death was indeed tragic. But the question before us is whether Lynch or PPOA owed a duty after Garrett terminated his

11

relationship and was discharged.  We conclude that there is no source for such a duty under the circumstances of this case.  Accordingly, we affirm the final judgment.

Affirmed.

LUCAS, C.J., and KELLY, J., Concur.

_____

Opinion subject to revision before official publication.